# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| SINCLAIR BROADCAST GROUP, INC. | : | |
| | : | |
| v. | : | Civil No. CCB-14-2614 |
| | : | |
| COLOUR BASIS, LLC | : | |
| | : | |

## MEMORANDUM

Sinclair Broadcast Group, Inc. ("SBG") has brought this declaratory judgment action against Colour Basis, LLC ("CB") and Christi Schreiber (collectively, "the defendants" or "counterclaimants"), requesting, *inter alia*, that the court find that SBG has not infringed CB's copyright. CB and Schreiber have brought counterclaims against SBG, Scott Livingston, and Samantha Dinges (collectively, "the counter-defendants"), alleging copyright infringement, circumvention of copyright protection systems, fraudulent inducement, and unfair competition. Now pending before the court are the counter-defendants' motion for summary judgment, and the defendants' motion for leave to file a surreply. Oral argument was heard on June 21, 2016. For the reasons that follow, the counter-defendants' motion for summary judgment will be granted in part and denied in part, and the defendants' motion to file a surreply will be denied as moot.[1]

## BACKGROUND

CB is a three-person media appearance consulting company based in Fort Worth, Texas, which provides image consultation services to on-air television personalities. (First Am. Countercl. ¶¶ 1, 3, ECF No. 47.) Schreiber is CB's president and chief executive officer ("CEO"). (*Id.* ¶ 12.) SBG is a television company with its principal place of business in

---

[1] The court also will grant the defendants' unopposed motion to seal, (ECF No. 60), in accordance with the stipulated confidentiality order signed by Judge J. Mark Coulson on April 3, 2015, (ECF No. 28).

Maryland that owns and operates, programs, or provides sales services to over 150 television stations in over seventy markets. (Second Am. Compl. ¶ 1, ECF No. 42.) David Smith is SBG's president and CEO. (Mot. Summ. J. Ex. 4, Livingston Dep. ("Summ. J. Livingston Dep.") 115:1-3, ECF No. 53-7.) Livingston became SBG's Vice President of News in March 2012. (Second Am. Compl. ¶ 9.)

Many of the facts in this case are undisputed. In 2011, CB, through Schreiber, began providing consulting services to on-air personalities at several television stations that are direct or indirect subsidiaries of SBG. (Second Am. Compl. ¶ 8; First Am. Countercl. ¶ 11.) In 2012, Schreiber contacted Livingston, and they began discussing the possibility of a group deal between SBG and CB. (Mot. Summ. J. Exs. 10 & 11, ECF Nos. 53-11 & 53-12; Opp'n Mot. Summ. J. Ex. K, ECF No. 58-11.) They also agreed that CB would create a "Style Guide" to establish standards and expectations for SBG's on-air talent. (Second Am. Compl. ¶ 13; Mot. Summ. J. Ex. 2, Schreiber Dep. ("Summ. J. Schreiber Dep.") 179:5-180:6, ECF No. 53-5.) Schreiber followed up about the group deal—without firm numbers—with emails in August and October 2012, (Mot. Summ. J. Exs. 12 & 13, ECF Nos. 53-13 & 53-14; Opp'n Mot. Summ. J. Exs. L & M, ECF Nos. 58-12 & 58-13), to which Livingston never responded, (Summ. J. Schreiber Dep. 167:18-168:4, 178:20-179:4). In January 2013, Schreiber gave a presentation about on-air appearance issues at a conference in Maryland for news directors employed by SBG subsidiaries. (Second Am. Compl. ¶¶ 15-16; Opp'n Mot. Summ. J. Ex. N, ECF No. 58-14.) Soon after the conference, Livingston told Schreiber that SBG would not be able to consider a group deal before the summer and, until then, the company would continue to work with CB on an as-needed basis. (Mot. Summ. J. Ex. 15, ECF No. 53-16; Summ. J. Schreiber Dep. 203:3-204:7.)

In March 2013, Schreiber proposed a $25,000 price tag for the Style Guide, which she

said would include 400 printed copies and 400 PDF licenses, and additional copies could be purchased on an as-needed basis. (Mot. Summ. J. Ex. 22, ECF No. 53-23; Opp'n Mot. Summ. J. Ex. S, ECF No. 58-19.) Livingston countered that he was looking to spend $12,000 to $15,000, and proposed that CB cut costs by providing a PDF-only version. (Mot. Summ. J. Ex. 23, ECF No. 53-24; Opp'n Mot. Summ. J. Ex. T, ECF No. 58-20.) Schreiber responded that she was willing to drop the price on the Style Guide because she was "not looking at the book as a big money maker, it's the relationship, future contract and being seen in each station that appeals to me," and noted that she would not be willing to offer a lower price if she "did not see the potential in future business with [SBG] and especially [its] interest in doing a multiple year deal." (Mot. Summ. J. Ex. 25, ECF No. 53-26; Opp'n Mot. Summ. J. Ex. U, ECF No. 58-21.) Importantly for this motion, the parties dispute the content of a telephone conversation between Livingston and Schreiber that occurred sometime at the end of March or the beginning of April 2013. According to Livingston, he explained to Schreiber that SBG would pay a flat fee for the Style Guide, to which it would have full rights without conditions. (Summ. J. Livingston Dep. 234:4-235:2.) In contrast, Schreiber claims to have clarified that any copies of a PDF-only Style Guide would have to be printed through her, and she was amenable to SBG's reduced price proposal only because of their future relationship and group deal. (Summ. J. Schreiber Dep. 222:13-224:15.) More specifically, the defendants allege in their counterclaims that the parties agreed that $15,000 would cover 400 PDF Style Guides, with extra copies requiring the payment of additional license fees, and that the Style Guide would be used as part of a multi-year consulting deal. (First Am. Countercl. ¶ 17.) On April 1, 2013, Livingston left Schreiber a voicemail requesting numbers for a group deal, which, he cautioned, was "no guarantee[]" because it would have to be approved within SBG. (Mot. Summ. J. Ex. 27, ECF No. 53-28;

Opp'n Mot. Summ. J. Ex. CC, ECF No. 58-29.)

On May 2, 2013, CB sent SBG an invoice for the Style Guide. (Mot. Summ. J. Ex. 36, Invoice, ECF No. 53-37.) The invoice description stated that it was for the "SBG Style Guide PDF create appearance policy manual," and the only term listed was that payment was "[d]ue on receipt." (*Id.*) SBG sent a $15,000 check to CB on May 23, 2013. (*Id.* Ex. 39, ECF No. 53-40.) On June 7, 2013, Schreiber sent Livingston the final Style Guide, (*id.* Ex. 45, ECF No. 53-46), which Livingston circulated to all SBG news directors on June 14, 2013, (*id.* Ex. 46, ECF No. 53-47). The document includes a CB copyright symbol on most pages, and explains that "[t]he SBG Style Guide is [SBG on-camera talent's] reference to the Sinclair Broadcast Group appearance policy as recommended and written by Colour Basis president and CEO, Christi Schreiber." (Mot. Summ. J. Ex. 9, Style Guide 5, ECF No. 53-10; Opp'n Mot. Summ. J. Ex. DD, Style Guide 5, ECF No. 58-30.)

Also in the spring of 2013, Livingston began communicating with Samantha Dinges about working at SBG as an internal image consultant. Dinges is Smith's stepdaughter and, at that time, was a costume designer for a television show, The Young and the Restless. According to Livingston, Smith broached the idea in early March, (Summ. J. Livingston Dep. 104:1-108:1, 108:17-22, 114:9-117:17), and on April 1, 2013, Livingston and Dinges met, (Mot. Summ. J. Ex. 20, ECF No. 53-21). After the meeting, at Livingston's request, Dinges reviewed broadcasts of a few SBG television stations and offered feedback on their newscasters' appearances. (*See* Mot. Summ. J. Ex. 35, ECF No. 53-36.) Ultimately, SBG created an internal image consultant position, for which Dinges was hired, and she started work on June 27, 2013. (Mot. Summ. J. Ex. 38, ECF No. 53-39.) Around the same time that Dinges began working at SBG, Livingston called Schreiber to tell her about the new position. (Opp'n Mot. Summ. J. Ex. B, Livingston Dep.

("Opp'n Livingston Dep.") 137:7-18, ECF No. 58-2; *id.* Ex. A, Schreiber Dep. ("Opp'n Schreiber Dep.") 246:13-247:22, ECF No. 58-1.) According to Schreiber, Livingston told her that their relationship would not change, and SBG would continue to use CB's consulting services. (Opp'n Schreiber Dep. 247:16-19, 248:16-20.) Livingston, in contrast, testified that he told Schreiber that SBG would use her on a case-by-case, station-by-station basis while they fleshed out Dinges's position. (Opp'n Livingston Dep. 137:15-18.) In an email at the beginning of July introducing Dinges to SBG news directors and general managers, Livingston said that Dinges would be the point person for all image consulting at SBG, including for enforcing the Style Guide's standards, and that Schreiber would continue to be available to stations on a case-by-case basis.[2] (Mot. Summ. J. Ex. 48, ECF No. 53-49.)

Approximately one year later, on July 2, 2014, the defendants registered the Style Guide with the U.S. Copyright Office. (Def. Answer ¶ 35, ECF No. 46.) Two weeks after the registration, defense counsel sent Smith a letter alleging that SBG was infringing CB's copyright by using unauthorized copies of the Style Guide and because the Style Guide was only to be used in connection with CB's consulting services. (Mot. Summ. J. Ex. 52, Counsel Letter 1, ECF No. 53-53.) On August 15, 2014, SBG brought this declaratory judgment action. (Compl., ECF No. 1.) SBG filed an amended complaint on September 7, 2015. (Second Am. Compl.) Count I of its amended complaint requests a declaratory judgment that: (1) SBG has an implied nonexclusive license to use the Style Guide, and its use of the Style Guide has been consistent with that license; (2) SBG owes no license fees to the defendants; (3) SBG has not infringed the defendants' copyright; (4) the defendants have no right to terminate the implied license; (5) SBG

---

[2] The defendants argue that Dinges was not qualified to be SBG's internal image consultant, and would have been incapable of meeting the position's obligations without the Style Guide. (*See* First Am. Countercl. ¶ 55.) They have gone to great lengths to make this point, including by introducing testimony and exhibits that, in the court's opinion, were irrelevant and unwarranted.

has not engaged in promissory fraud; and (6) SBG has not engaged in unfair competition. (Second Am. Compl. ¶¶ 43, 44.) It also requests that the court issue an injunction ordering the defendants not to interfere with SBG's use of the Style Guide. (*Id.* ¶ 44.) In Counts II and III of the complaint, the plaintiffs have alleged, as alternatives to the declaratory judgment and injunctive relief count, fraud and negligent misrepresentation, respectively. (*Id.* ¶¶ 45-60.) The defendants answered the amended complaint on September 21, 2015, and filed their amended counterclaims on September 24, 2015. CB and Schreiber allege that all counter-defendants are liable for copyright infringement, circumvention of copyright protection systems in violation of 17 U.S.C. § 1201, and unfair competition; and that SBG and Livingston are liable for fraudulent inducement. (First Am. Countercl. ¶¶ 31-59.) The defendants allege that they are entitled to actual damages and profits for any infringement, statutory damages for infringement after they registered their copyright, and punitive damages for the fraudulent inducement and unfair competition claims. (*Id.* ¶¶ 37, 50, 58.) The counter-defendants answered on October 13, 2015, (Counter-defs. Answer, ECF No. 51), and filed a motion for summary judgment on October 27, 2015, requesting that the court enter partial summary judgment in their favor on Count I of their amended complaint, the declaratory judgment claim, and against the defendants on all counts of their amended counterclaims or, in the alternative, on Counts I, III, and IV of their counterclaims, (Mot. Summ. J. Mem. Law 49, ECF No. 53-1). The defendants opposed that motion, (Opp'n Mot. Summ. J., ECF No. 58), and the counter-defendants replied, (Reply, ECF No. 66). The defendants also have filed a motion for leave to file a surreply in order to, *inter alia*, respond to the counter-defendants' criticism of CB's expert, Brian Greif. (Surreply Mot., ECF No. 67.) The counter-defendants have opposed that motion. (Opp'n Surreply Mot., ECF No. 68.)

For the reasons that follow, the court will grant in part and deny in part the counter-defendants' motion for summary judgment. The court will deny as moot the defendants' motion for leave to file a surreply.

**STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247-48 (alteration in original). The court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007); *see also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015). At the same time, the court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)).

**ANALYSIS**

I.  <u>Copyright infringement</u>

   **a.  Implied nonexclusive license**

7

In order to prove copyright infringement, a plaintiff must establish that it owns a valid copyright, and the defendant engaged in unauthorized copying of the work protected by the copyright. *See Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 513 (4th Cir. 2002). SBG does not appear to contest that CB owns a valid copyright to the Style Guide. Instead, SBG alleges that it cannot be held liable for copyright infringement because it enjoyed an implied nonexclusive license to use the Style Guide, which constitutes an affirmative defense to an allegation of copyright infringement. *See id.* at 514. Accordingly, SBG has the burden of establishing an implied license. *See Atkins v. Fischer*, 331 F.3d 988, 992 (D.C. Cir. 2003).

An implied nonexclusive license for the use of a copyright-protected work is created "when (1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee copy and distribute his work." *Nelson-Salabes*, 284 F.3d at 514 (adopting the three-part test from *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555 (9th Cir. 1990)). The Fourth Circuit has said that courts should examine the totality of the circumstances when determining the licensor's intent, and has identified three nonexclusive factors to assist with that inquiry: "(1) whether the parties were engaged in a short-term discrete transaction as opposed to an ongoing relationship; (2) whether the creator utilized written contracts . . . providing that copyrighted materials could only be used with the creator's future involvement or express permission; and (3) whether the creator's conduct during the creation or delivery of the copyrighted material indicated that use of the material without the creator's involvement or consent was permissible." *Id.* at 515-16.

Here, it is undisputed that SBG, the licensee, requested the creation of the Style Guide, which CB, the licensor, created and delivered. Accordingly, only the third prong of the *Effects*

*Associates* test is at issue. The first *Nelson-Salabes* factor indicates neither an intent to grant nor an intent to deny a license without CB's future involvement. On the one hand, CB had done work for various SBG affiliates over the course of approximately two years. On the other hand, these jobs were negotiated individually with the stations; SBG's invitation for Schreiber to present at the January 2013 conference appears to have been a one-time request; and there is an issue of fact, discussed further below, as to whether the Style Guide was to be part of a package that included a group deal between SBG and CB. *See Asset Mktg. Sys., Inc. v. Gagnon*, 542 F.3d 748, 756 (9th Cir. 2008). The second factor favors SBG. There is no written contract between the parties, and CB's invoice—the only written document that exists related to the Style Guide aside from emails—indicates no terms associated with the project, other than that payment was "[d]ue on receipt." (Invoice.) For the third factor, the court is sympathetic to many of SBG's arguments. Ultimately, however, the summary judgment standard mandates that this court credit CB's version of the facts, and Schreiber claims that, in the controverted phone call at the end of March or the beginning of April 2013, she made clear to Livingston that she was accepting his lowered price proposal only because SBG would be required to pay for additional licenses and printed copies of the Style Guide, and SBG's use of the Style Guide would be accompanied by CB's services as part of a group deal. *Cf. Atkins*, 331 F.3d at 993 ("Such statements are appropriate evidence in determining whether an implied nonexclusive license arises from the conduct of the parties, and further expose the genuine issue of material fact that requires jury deliberation." (internal citation omitted)). Further, Schreiber's email with her original cost proposal specifically said that her suggested price would include 400 printed copies and 400 PDF licenses, (Mot. Summ. J. Ex. 22; Opp'n Mot. Summ. J. Ex. S), and a follow-up email the next week about a PDF-only Style Guide also mentioned licenses, (Mot. Summ. J. Ex. 25), suggesting she did not

anticipate granting an implied nonexclusive license to SBG, at least not one with the scope SBG contemplates. To the extent the counter-defendants argue that CB's inaction in the face of SBG's use of the Style Guide argues for an implied nonexclusive license, again, at least one version of the facts according to CB dictates otherwise. In particular, Schreiber claims that Livingston, when he called about Dinges, said that SBG's relationship with CB would not change, and his company would continue to use CB's consulting services.[3] Assuming these facts to be true, and recognizing also that Schreiber continued to reach out to SBG stations after this phone call, if not to Livingston himself, the court at this stage cannot find as a matter of law that SBG possessed an implied nonexclusive license to the Style Guide. Accordingly, the counter-defendants' motion for summary judgment regarding the implied nonexclusive license will be denied.

### b. Circumvention of copyrighted materials, 17 U.S.C. § 1201

The counter-defendants' motion requests that the court grant summary judgment in its favor on the counterclaimants' allegations that SBG, Livingston, and Dinges violated the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1201. The DMCA prohibits "circumvent[ing] a technological measure that effectively controls access to a work protected under [the Copyright Act]." 17 U.S.C. § 1201(a)(1)(A). The DMCA defines circumvention as an action that intends "to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner." *Id.* § 1201(a)(3)(A). In addition, the statute provides that "a technological

---

[3] The court acknowledges that the defendants have not been consistent in describing the contents of this telephone conversation. In their counterclaims, the defendants state that Livingston "contacted Colour Basis and explained that it had hired a full-time employee to utilize Colour Basis's Style Guide to consult with on-camera talent and that there would be no multi-year consulting deal contrary to SBG's and Livingston's agreement." (First Am. Countercl. ¶ 21.) In their opposition to the motion for summary judgment and in Schreiber's deposition, in contrast, the defendants allege that Livingston said the relationship between SBG and CB would not change. (*See, e.g.*, Opp'n Mot. Summ. J. 28; Opp'n Schreiber Dep. 247:16-19, 248:16-20.) At the June 21 hearing, the defendants represented to the court that they were alleging the second set of circumstances. Due to that clarification, and because the court will view the evidence in the light most favorable to the defendants, the court will assume that CB believed its relationship with SBG would continue even after Dinges was hired.

measure 'effectively controls access to a work' if the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work." *Id.* § 1201(a)(3)(B). However, merely alleging that a defendant "accessed" a copyrighted work that is protected by a technological measure is not enough to state a claim for a violation of the DMCA. Rather, "[t]he plain language of the statute [] requires a plaintiff alleging circumvention . . . to prove that the defendant's access was unauthorized." *See Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d 678, 691 (D. Md. 2011) (alteration in original) (quoting *Chamberlain Grp. v. Skylink Techs., Inc.*, 381 F.3d 1178, 1193 (Fed. Cir. 2004)).[4]

In their counterclaims, the counterclaimants allege that SBG, Livingston, and Dinges "willfully removed the password protection and print disabling technological measures that controlled access to the copyright protected Style Guide." (First Am. Countercl. ¶¶ 24, 26, 28.) Because, however, the counterclaimants gave the counter-defendants access to the copyrighted work, the PDF Style Guide, they cannot make out a violation of the DMCA. Further, the evidence of the alleged circumvention—the email attached to Schreiber's affidavit from AlphaGraphics, the firm CB says added password protections to the Style Guide—is inadmissible hearsay. (Opp'n Mot. Summ. J. Ex. HH 3, ECF No. 58-34.) To be entitled to consideration on summary judgment, facts set forth in affidavits must be such as "would be admissible in evidence." Fed. R. Civ. P. 56(c); *see also Sakaria v. Trans World Airlines*, 8 F.3d 164, 171 (4th Cir. 1993) (finding that the district court properly did not consider inadmissible hearsay in an affidavit filed with a motion for summary judgment). "While properly authenticated e-mails may be admitted into evidence under the business records exception, . . .

---

[4] The *Ground Zero* opinion also noted that using a password "to access a copyrighted work, even without authorization, does not constitute 'circumvention' under the DMCA." *Id.* at 692.

[a]n e-mail created within a business entity does not, for that reason alone, satisfy the business records exception of the hearsay rule." *United States v. Cone*, 714 F.3d 197, 220 (4th Cir. 2013) (internal quotations and citations omitted). Without providing more of a basis to establish that it was kept as part of the business's regular operations, the AlphaGraphics e-mail cannot be admitted under an exception to the hearsay rule. *Id.* Finally, the counter-defendants said they had no difficulty printing the Style Guide, and defense counsel at the hearing cited no evidence as to how the circumvention allegedly occurred. Accordingly, the counter-defendants' motion for summary judgment on the counterclaimants' circumvention claim will be granted.

### c.  Damages

#### i.  *Willful infringement*

At any time before final judgment is entered, a copyright owner may elect to recover statutory damages instead of actual damages and profits.[5] *See* 5 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 14.01[B]. The Copyright Act permits a court to increase statutory damages to a maximum of $150,000 per infringed work if "the copyright owner sustains the burden of proving, and the court finds, that infringement was committed willfully."[6] 17 U.S.C. § 504(c)(2). "Willfulness" means that the infringer either had actual knowledge that it was infringing the owner's copyrights or acted in reckless disregard of those rights. *Brown v. McCormick*, 87 F. Supp. 2d 467, 482 (D. Md. 2000). "Evidence that the infringed works bore prominent copyright notices supports, but by no means compels, a finding of willfulness."

---

[5] At the June 21 motions hearing, the defendants represented that they did not believe they were entitled to statutory damages. The court will assume for purposes of this motion that they were representing only that they cannot seek statutory damages for any infringement that occurred before they registered their copyright, given that their amended counterclaims allege the right to recover statutory damages. (*See, e.g.*, First Am. Countercl. ¶ 37, 14 ¶ 8.)

[6] Unlike for statutory damages, the section of the Copyright Act addressing actual damages and profits does not mention "willfulness." 17 U.S.C. § 504(b). A few courts—as far as this court has found, only in the Southern District of New York—have held that punitive damages may be awarded where the plaintiff elected to receive actual damages and the defendants engaged in willful infringement. *Compare Caffey v. Cook*, 409 F. Supp. 2d 484, 510 (S.D.N.Y. 2006), *with Leonard v. Stemtech Health Scis., Inc.*, 981 F. Supp. 2d 273, 279 (D. Del. 2013).

*Lowry's Reports, Inc. v. Legg Mason, Inc.*, 271 F. Supp. 2d 737, 753 (D. Md. 2003). The defendants allege that SBG, Livingston, and Dinges willfully infringed CB's copyright by copying, printing, and distributing copies of the Style Guide without authorization. (First Am. Countercl. ¶¶ 33, 34.)

The question is a close one. The court, however, must credit Schreiber's version of her telephone conversation with Livingston at the end of March or beginning of April 2013. If Schreiber in fact made clear to Livingston that SBG was required to purchase additional licenses of the Style Guide and use it only in conjunction with CB's services, then the court cannot say that any use of the Style Guide by SBG in contravention of that alleged agreement was not willful. Accordingly, the court will deny the counter-defendants' motion for summary judgment as to willfulness.

### ii.  *SBG's profits attributable to infringement*

In their motion for summary judgment, the counter-defendants argue that CB has not met its burden of establishing a nexus between SBG's use of the Style Guide and the company's profits. (Mot. Summ. J. Mem. Law 34-38.) The Copyright Act provides that "[t]he copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. § 504(b). To establish the infringer's profits, the section requires "the copyright owner [] to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." *Id.* The Fourth Circuit has interpreted the term "gross revenue" to refer only to revenue "reasonably related to the infringement." *Bonner v. Dawson*, 404 F.3d 290, 294 (4th Cir. 2005); *see also Bouchat*, 346

F.3d at 520-21.

There are three avenues by which a defendant (in this case, the counter-defendants) can argue that summary judgment is appropriate for all or some of a plaintiff's (in this case, the counterclaimants') profit damages. *Dash v. Mayweather*, 731 F.3d 303, 330-31 (4th Cir. 2013). First, summary judgment is appropriate if the plaintiff fails to meet his initial burden of proving the infringer's gross revenues because there is "no conceivable connection between the infringement and those revenues." *Id.* at 328. Establishing a conceivable connection is not an exacting standard, and a proffered connection will be considered "conceivable" as long as it is "hypothetically possible," even if it is "highly unlikely that the infringement actually contributed to the claimed revenues." *Id.* at 330. Second, summary judgment is appropriate if, despite the existence of a conceivable connection, the plaintiff has offered "only speculation as to the existence of a causal link between the infringement and the revenues." *Id.* at 328 (alteration in original) (internal quotation omitted). To demonstrate a causal link, the plaintiff must show that "the infringement could reasonably be viewed as one of the causes of the claimed revenues." *Id.* at 331. Finally, summary judgment may be granted if the defendants file a properly supported motion for summary judgment showing that "the claimed revenues are attributable entirely to factors other than the infringement, and the plaintiff fails to respond with evidence that can raise a genuine dispute as to the issue." *Id.* at 328 (internal quotation omitted).

In their response in opposition to the motion for summary judgment, the defendants argue that the profits attributable to SBG's infringement of the Style Guide are the combined revenues "generated from the sale of advertising time slots within the local newscasts and within the shows aired just before and just after the local newscasts, for each station that received a copy of the Style Guide, for the time period during which it had the Style Guide." (Opp'n Mot. Summ. J.

35.) In support of this argument, the defendants offer the affidavit of Brian Greif, who has worked as a reporter and anchor for various television stations, and in management positions at media companies. (Opp'n Mot. Summ. J. Ex. G, Greif Aff., ECF No. 58-7.) Greif avers that, based on his experience and the market research he previously conducted, "a viewer's decision to watch a particular news station is guided in part by the social affinity of the on-air talent, which is largely driven by their clothing, hairstyle and makeup." (*Id.* ¶ 14.) In their reply, the counter-defendants argue that Greif's affidavit should be excluded, either because he has no personal knowledge of SBG's operations or under Federal Rule of Evidence 702. (Reply, 18-20.) CB and Schreiber have filed a motion for leave to file a surreply in order to address the counter-defendants' arguments about Greif.

Here, the counterclaimants cannot survive the motion for summary judgment. At this point, the court cannot say that there is no conceivable connection between the alleged infringement of the Style Guide and the advertising revenues of SBG's affiliate stations. But even considering Greif's affidavit, CB and Schreiber have not demonstrated the existence of a nonspeculative causal link.[7] In *Dash*, the plaintiff argued that, because his song was played in connection with Mayweather's appearance at two broadcasted events, "the revenues from those events . . . were derived exclusively from the infringed work, and that this fact alone [was] sufficient to establish a causal link." *Dash*, 731 F.3d at 332 (internal quotations omitted). Dash, however, had not provided any evidence to show that the alleged infringement "*increased* any of the . . . revenue streams." *Id.* The Fourth Circuit noted that he was required to make this showing, and that any argument to the contrary was foreclosed by *Bouchat*, in which the court "specifically required a causal link between the infringement and the *level* of the defendants'

---

[7] Because the court will consider Greif's affidavit for purposes of this motion, the defendants' motion for leave to file a surreply will be denied as moot. Neither party will be precluded from raising *Daubert* motions at the appropriate time.

revenues." *Id.* n.18 (alteration and internal quotation omitted). Here, to demonstrate "the relevant revenue stream from which SBG's profits should be determined," (Opp'n Mot. Summ. J. 36), CB provided charts identifying the advertising revenues of SBG local newscasts, and of the programs before and after the newscasts, for the period of time when those stations possessed the Style Guide. (*Id.* Ex. LL, ECF No. 58-38.) Neither those charts, however, nor any other evidence provided by CB, including Greif's affidavit, demonstrates that the Style Guide *increased* SBG's advertising revenues. Accordingly, under the standard articulated in *Dash*, CB has not demonstrated a nonspeculative causal link between the alleged infringement and the advertising revenues from SBG's newscasts. The motion for summary judgment as to SBG's profit damages will be granted.

i.   *Actual Damages*

In their amended counterclaims, the defendants argue that they are entitled to "actual, compensatory and punitive damages," including $2.3 million in lost income. (First Am. Countercl. 14 ¶¶ 7, 8.) Despite specifically alleging that, as a result of the counter-defendants' alleged copyright infringement, "Colour Basis is entitled to actual damages, including Colour Basis' lost profits," (*id.* ¶ 37), the defendants appear to dispute SBG's argument against lost profits only as it relates to their state-law claims, (Opp'n Mot. Summ. J. 46-48 ("With regard to its [state law claims], Colour Basis seeks damages in the amount of the value of the multi-year consulting deal with SBG.")). Further, at the June 21 hearing, the defendants appeared to represent that they could recover their lost profits only under their fraud claim. Given the content of their counterclaims, however, the court nonetheless will address the defendants' right to lost profits as it relates to their copyright infringement claim.

Under the Copyright Act, actual damages represent "the extent to which infringement has

16

injured or destroyed the market value of the copyrighted work at the time of infringement."
Nimmer § 14.02[A] (footnote omitted). Actual damages "may be said to equal the profits that the
plaintiff might have accrued but for the defendant's infringement." *Id.* § 14.02[A][1]. However,
"[i]n the absence of convincing evidence as to the volume of sales that plaintiff would have
obtained but for infringement, the measure of lost profits may be rejected as too speculative." *Id.*;
*see also Dash*, 731 F.3d at 313 ("[T]he amount of [actual] damages sought cannot be based on
'undue speculation.'"). Because it has brought this motion for summary judgment, SBG first
must "show that there [is] no genuine dispute among the parties as to the *existence* of any actual
damages." *Dash*, 731 F.3d at 313 (alteration in original); *see also* Nimmer § 14.02[A][3]
("Uncertainty will not preclude recovery of actual damages if the uncertainty is as to amount, not
as to whether actual damages are attributable to the infringement."). If such a showing is made,
CB and Scheriber "must respond with nonspeculative evidence that such damages do, in fact,
exist." *Id.* at 313.

In its supplemental answer to SBG's Interrogatory No. 3, CB explains that it is seeking
lost profits based on the income it would have earned through consulting work and product sales
over three years for the forty television stations affiliated with SBG in early 2013. (Mot. Summ.
J. Ex. 68, CB Suppl. Answer 1, ECF No. 53-69.) CB arrived at its estimate of $2.3 million by
multiplying Schreiber's in-person and online consulting rates by the number of sessions she
would have provided to each affiliate over a period of three years, and by estimating a certain
number of product sales to SBG affiliates. (*Id.* at 2.) In its motion for summary judgment, the
counter-defendants take issue with those numbers. (Mot. Summ. J. Mem. Law 47-48.) In
particular, they argue that the calculations use CB's normal billing rate, as opposed to a reduced
group rate, and contemplate Schreiber consulting 310 days of the year, when there are only 260

17

work days in a year. (*Id.*) While there may be issues with these numbers, and it may turn out that CB's measure of lost profits is too speculative, the counter-defendants have not shown that there is no genuine dispute among the parties as to the existence of *any* actual damages. Accordingly, the motion for summary judgment as to CB's lost profits will be denied.

In conclusion, the counter-defendants' motion for summary judgment regarding the implied nonexclusive license will be denied, and their motion for summary judgment on the counterclaimants' circumvention claim will be granted. In terms of damages, the court will deny the counter-defendants' motion for summary judgment as to willfulness and CB's lost profits, and grant it as to CB's claims to SBG's profits. The counterclaimants also have preserved the right to request statutory damages for any infringement that occurred after they registered their copyright.

## II.   State law claims[8]

Although the court finds that the defendants' state law claims are not preempted by the Copyright Act, the counterclaimants have not demonstrated that a reasonable factfinder could conclude by clear and convincing evidence that Livingston made false representations with the deliberate intent to deceive CB and Schreiber, or that punitive damages are justified. Accordingly, only the defendants' unfair competition claim and their request for lost profit damages will survive the motion for summary judgment.

---

[8] "When choosing the applicable state substantive law while exercising diversity or supplemental jurisdiction, a federal district court applies the choice of law rules of the forum state." *Ground Zero*, 813 F. Supp. 2d at 696. Under Maryland's choice-of-law principles, tort claims are governed by the law of the state where the alleged harm occurred ("lex loci delicto"). *See, e.g.*, *Proctor v. Wash. Metro. Area Transit Auth.*, 990 A.2d 1048, 1068 (Md. 2010). "This means the applicable law is the law of the state where the last event necessary to make an actor liable for an alleged tort takes place." *DiFederico v. Marriott Int'l, Inc.*, 714 F.3d 796, 807 (4th Cir. 2013) (internal quotation omitted). The Maryland Court of Appeals has not addressed where the "wrong" occurs in cases of pecuniary injury resulting from fraud "when the alleged wrongful act or omission occurred in one jurisdiction and the 'loss' by plaintiff in another jurisdiction." *Philip Morris Inc. v. Angeletti*, 752 A.2d 200, 233 n.28 (Md. 2000). The parties cite only to Maryland law in addressing the counterclaimants' state law claims. (*See* Mot. Summ. J. Mem. Law 43-49; Opp'n Mot. Summ. J. 43-49.) Accordingly, the court will assume without deciding that Maryland law applies.

a. **Preemption**

SBG's motion for summary judgment argues that CB's state law claims for fraudulent inducement and unfair competition are preempted by the Copyright Act. For the reasons that follow, the counter-defendants' motion for summary judgment with regard to preemption of the defendants' state law claims will be denied.

The Copyright Act preempts state-law claims if "the work is within the scope of the 'subject matter of copyright' as specified in 17 U.S.C. §§ 102, 103," and "the rights granted under state law are equivalent to any exclusive rights within the scope of federal copyright as set out in 17 U.S.C. § 106." *Rosciszewski v. Arete Assocs., Inc.*, 1 F.3d 225, 229 (4th Cir. 1993); *see also Tire Eng'g & Distrib., LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 309 (4th Cir. 2012). The parties do not appear to dispute that the Style Guide is within the subject matter of copyright. The question, then, is whether the state rights are equivalent to any of the exclusive rights granted by federal copyright law. Section 106 of the Copyright Act "affords a copyright owner the exclusive right to: (1) reproduce the copyrighted work; (2) prepare derivative works; (3) distribute copies of the work by sale or otherwise; and, with respect to certain artistic works, (4) perform the work publicly; and (5) display the work publicly." *Rosciszewski*, 1 F.3d at 229 (quoting *Computer Assocs. Int'l v. Altai, Inc.*, 982 F.2d 693, 716 (2d Cir. 1992)). In order to ascertain whether a specific state cause of action involves a right equivalent to one of those identified in § 106, "reference must be made to the elements of the state cause of action." *Id.* If an extra element is required instead of, or in addition to, the acts of reproduction, performance, distribution, or display, there is no preemption of the state cause of action, provided that the extra element changes the "nature of the action so that it is *qualitatively* different from a copyright infringement claim." *Id.* at 230 (alteration in original) (quoting *Mayer v. Josiah Wedgwood &*

*Sons, Ltd.*, 601 F. Supp. 1523, 1535 (S.D.N.Y. 1985)).

To recover for fraudulent inducement in Maryland, a plaintiff must prove "(1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation." *CapitalSource Fin., LLC v. Delco Oil, Inc.*, 608 F. Supp. 2d 655, 666 (D. Md. 2009) (quoting *Nails v. S & R, Inc.*, 639 A.2d 660, 668 (Md. 1994)). In order to recover for fraud, "the misrepresentation must be made with the deliberate intent to deceive." *Sass v. Andrew*, 832 A.2d 247, 260 (Md. Ct. Spec. App. 2003). The elements of fraudulent inducement, which include misrepresentation, are not equivalent to the rights under the Copyright Act. Therefore, the counterclaimants' fraudulent inducement claim is not preempted.

Under Maryland law, the doctrine of unfair competition extends to "all cases of unfair competition in the field of business."[9] *Balt. Bedding Corp. v. Moses*, 34 A.2d 338, 342 (Md. 1943). "What constitutes unfair competition in a given case is governed by its own particular facts and circumstances." *Id.* The distinction between those unfair competition claims that are not preempted and those that are is that "claims based upon breaches of confidential relationships, breaches of fiduciary duty and trade secrets have been held to satisfy the extra-element test, whereas claims of misappropriation and unfair competition based solely on the copying of the plaintiff's protected expression fail that test." *Costar Grp. Inc. v. Loopnet, Inc.*,

---

[9] In the section of their counterclaims requesting judgment and relief, the counterclaimants allege that the counter-defendants have engaged in unfair competition under "federal and Maryland law." (First Am. Countercl. 14 ¶ 6.) Because the parties only address the counterclaimants' state law unfair competition claim, (Mot. Summ. J. Mem. Law 2, 41, 46; Opp'n Mot. Summ. J. 43, 45-46), the court will not address any federal claims of unfair competition.

164 F. Supp. 2d 688, 713 (D. Md. 2001) (internal citations omitted); *see also Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 660 (4th Cir. 1993) (finding that a trade secret misappropriation claim based on "the breach of a duty of trust or confidentiality" was not preempted by the Copyright Act). In its amended counterclaims, CB alleges that the counter-defendants deceived CB into creating the Style Guide, which SBG used without CB's authorization or consulting services. (First Am. Countercl. ¶¶ 54-56.) The defendants' unfair competition claim focuses not just on the alleged unauthorized copying and printing of the Style Guide, but on the deception the counter-defendants allegedly used to persuade Schreiber to create the Style Guide. (*See* First Am. Countercl. ¶¶ 52, 55, 56.) Deception is not an element of copyright infringement. *See Victor Stanley, Inc. v. Creative Pipe, Inc.*, 2011 WL 4596043, at *8 (D. Md. Sept. 30, 2011).[10] Accordingly, the counterclaimants' unfair competition claim is not preempted.

### b. Fraudulent inducement

The counter-defendants argue that, even if the fraudulent inducement claim is not preempted by the Copyright Act, the counterclaimants have not provided enough evidence to survive the motion for summary judgment on that claim. CB and Schreiber must establish the elements of fraudulent inducement by clear and convincing evidence, *see VF Corp. v. Wrexham Aviation Corp.*, 715 A.2d 188, 193 (Md. 1998), a standard this court must take into account on a motion for summary judgment, *see Anderson*, 477 U.S. at 244, 252. "To be clear and convincing, evidence should be 'clear' in the sense that it is certain, plain to the understanding, and unambiguous and convincing in a sense that it is so reasonable and persuasive as to cause you to believe it." *Attorney Grievance Comm'n of Md. v. Levin*, 91 A.3d 1101, 1105 (Md. 2014) (quoting Maryland civil pattern jury instructions).

---

[10] Unpublished opinions are cited for the soundness of their reasoning, not for any precedential value.

The counterclaimants have not made the heightened showing necessary to establish the elements of a fraudulent inducement claim. They claim that Schreiber made clear to Livingston during the disputed phone call that she agreed to the Style Guide at SBG's lower price only under the assumption that CB and SBG would sign a group deal, and that, even after Dinges was hired, Livingston was not honest with Schreiber about how Dinges's position would affect the parties' business relationship going forward. The weight of the evidence, however, especially under the standard of clear and convincing evidence, does not support the conclusion that Livingston made a false representation with the deliberate intent to deceive. Further, the evidence does not support a finding that Schreiber justifiably relied on any false representations Livingston may have made. Even under her version of events, Schreiber can point to only one conversation where Livingston allegedly promised a group deal and that additional licenses would be purchased through CB. The other evidence in the record—such as Schreiber's awareness as early as February 2013 that a group deal would have to be approved by someone other than Livingston, (Mot. Summ. J. Ex. 15, ECF No. 53-16), a fact that was reiterated in early April, (*id.* Ex. 27 (Livingston voicemail explaining that there were "no guarantees" about a group deal, which would need "fifth floor" approval)), and that no particular offer terms were ever reduced to writing, (*see* Invoice)—suggests that the parties never reached an agreement. Although the defendants' allegations are sufficient to overcome the motion for summary judgment on the copyright infringement claim, the court does not believe that a reasonable factfinder could conclude "with convincing clarity" that any SBG misrepresentation was made for the purpose of defrauding the counterclaimants, or that Schreiber was justified in her reliance. *Anderson*, 477 U.S. at 252. The counter-defendants' motion for summary judgment as to the fraudulent inducement claim will be granted.[11]

---

[11] At the June 21 hearing, the defendants raised the possibility of fraud by omission. Maryland recognizes a cause of

### c.  Unfair competition

The Maryland tort of unfair competition is related to the tort of fraudulent inducement, but "is a more flexible cause of action." *Core Commc'ns, Inc. v. Verizon Md. LLC*, 744 F.3d 310, 324 (4th Cir. 2014) (internal quotation and alternation omitted). It is aimed at "prevent[ing] dealings based on deceit and dishonesty," and provides a cause of action for "damaging or jeopardizing another's business by fraud, deceit, trickery or unfair methods of any sort." *Baltimore Bedding Corp.*, 34 A.2d at 342. Whether a defendant's actions amount to unfair competition depends on the particular facts of the case. *Id.* There are no specific elements to the tort; rather, "[e]ach case is a law unto itself, subject, only, to the general principle that all dealings must be done on the basis of common honesty and fairness, without taint of fraud or deception." *Id.* The tort must be proved by a preponderance of the evidence. *See Lockwood v. Friendship Club*, 95 F. Supp. 614, 619 (D. Md. 1951).

Given the flexibility of the cause of action, and the fact that the counterclaimants do not have to allege justifiable reliance in order to make out a claim of unfair competition, the court cannot say that, drawing all inferences in favor of CB, a reasonable jury could not find that SBG used "unfair methods of any sort" in its communications with Schreiber regarding the Style Guide and potential group deal. Accordingly, the court will deny SBG's motion for summary judgment on the counterclaimants' unfair competition claim.

---

action based on fraudulent concealment of material facts. *See Hill v. Brush Eng'red Materials, Inc.*, 383 F. Supp. 2d 814, 820 (D. Md. 2005). Generally, concealment constitutes fraud only if there is a duty of disclosure. *See Impala Platinum Ltd. v. Impala Sales (U.S.A.), Inc.*, 389 A.2d 887, 903 (Md. 1978). "Even in the absence of a duty of disclosure," however, "one who suppresses or conceals facts which materially qualify representations made to another may be guilty of fraud." *Finch v. Hughes Aircraft Co.*, 469 A.2d 867, 891 (Md. Ct. Spec. App. 1984) (affirming and adopting as its own the lower court's opinion). Although the evidence may better support a claim based on the contention that Livingston intentionally withheld material information from Schreiber, rather than one alleging that SBG intentionally made affirmative false representations to CB, the defendants did not plead fraudulent concealment. Even assuming they could demonstrate by clear and convincing evidence that SBG or Livingston fraudulently concealed a material fact, however, the defendants would still have to show justifiable reliance. *See Hill*, 383 F. Supp. 2d at 820.

**d.  Damages**

The counterclaimants allege that the unfair competition claim entitles them to the $2.3 million in income they would have earned through a consulting agreement with, and the sale of products to, the forty SBG affiliates over three years, and punitive damages of at least $4.6 million. (First. Am. Countercl. ¶¶ 57, 58.) The counter-defendants' motion for summary judgment on these claims will be denied as to the defendants' lost profits, and granted as to the request for punitive damages.

i.  *Lost Profits*

In their amended counterclaims, the defendants argue that they are entitled to "actual, compensatory and punitive damages," including $2.3 million in lost income. (First Am. Countercl. 14 ¶ 7.) To be recoverable, "damages must be reasonably certain and not based on speculative, remote, or uncertain figures." *Dierker v. Eagle Nat'l Bank*, 888 F. Supp. 2d 645, 658 (D. Md. 2012) (footnote omitted) (citation omitted). However, CB and Schreiber are "not required to prove the amount of [their] damages with mathematical precision; rather, [they are] only required to produce sufficient facts and circumstances that would permit a trier of fact to make an intelligent and reasonable estimate of the amount." *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Corp.*, 65 F.3d 1113, 1124-25 (4th Cir. 1995) (emphasis omitted) (citations omitted).

The counter-defendants argue that the claim for lost profits is speculative and, therefore, not recoverable. (Mot. Summ. J. Mem. Law 47-48.) As explained earlier in this memorandum, however, there may be some lost profits that the counterclaimants can prove with reasonable certainty, even if those damages do not reach the $2.3 million that CB estimates. Accordingly, the motion for summary judgment as to CB's lost profits will be denied.

ii.   *Punitive Damages*

Under Maryland law, punitive damages may only be awarded when a plaintiff has demonstrated by clear and convincing evidence that a defendant has acted with "actual malice."[12] *Darcars Motors of Silver Spring, Inc. v. Borzym*, 841 A.2d 828, 837 (Md. 2004). Actual malice is defined as "conduct of the defendant characterized by evil motive, intent to injure, ill will, or fraud." *Id.* (citation omitted). A "reckless disregard for the truth" does not support punitive damages. *Id.* (citation omitted).

Based on the record discussed above, CB and Schreiber cannot show by clear and convincing evidence "actual malice" on the part of Livingston, Dinges, or SBG. Accordingly, they are not entitled to punitive damages for any unfair competition, and the counter-defendants' motion for summary judgment as to that claim will be granted.

## CONCLUSION

For the reasons stated above, this court will grant in part and deny in part the counter-defendants' motion for summary judgment. It will deny as moot the defendants' motion for leave to file a surreply. The defendants' motion to seal will be granted. A separate order follows.


June 29, 2016                              /s/
Date                                       Catherine C. Blake
                                           United States District Judge

---

[12] Punitive damages must be supported by an award of compensatory damages, even if only in a nominal amount. *See Shabazz v. Bob Evans Farms, Inc.*, 881 A.2d 1212, 1236 (Md. Ct. Spec. App. 2005).